## LOGAN COUNTY NATIONAL BANK *v.* TOWNSEND.

ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

No. 170. Submitted January 22, 1891. — Decided March 2, 1891.

T. sold to a national bank, for sixty-eight cents on the dollar, $12,800 of the bonds of a municipal corporation issued in aid of a railroad under an .agreement that the bank would, upon demand, replace them to him at the same or a less price. Subsequently, he demanded compliance with this agreement, but the bank refused. In an action brought against the bank in a state court to recover the difference between the amount it paid for the bonds, and their value at the time they were demanded, the defence in part was that the bank had no authority, under its charter and the national banking act, to make the alleged agreement and purchase, and, by reason of such want of authority, could not be held liable to the plaintiff in any amount or upon any ground whatever. This defence was overruled in the state courts of original and appellate jurisdiction. *Held,*

(1) That this court had jurisdiction to review the judgment, so far as it involved the question whether the bank was exempted by the act of Congress or by its charter, from liability to account to the plaintiff for the value of the bonds which the jury found were purchased by it from the plaintiff, to be returned to him on demand at the same or a less price;

(2) The national banking act is an enabling act for associations organized under it, and one cannot rightfully exercise any powers except those expressly granted, or such incidental powers as are necessary to carry on the business for which it was established;

(3) But that act does not give a national bank an absolute right to retain bonds coming into its possession, by purchase, under a contract which it was without legal authority to make. Although the bank is not bound to surrender possession of them, until reimbursed the full amount due to it, and may hold them as security for the return

of the consideration paid, yet when such amount is returned, or tendered back to it and the return of the bonds demanded, its authority to retain them no longer exists; and, from the time of such demand and its refusal to surrender the bonds to the vendor or owner, it becomes liable for their value upon grounds of implied contract, apart from the original agreement under which it obtained them. It could not rightfully hold them under or by virtue of the contract, and at the same time refuse to comply with the terms of purchase.

THE federal question is stated in the opinion.

*Mr. Wilbur F. Browder* for plaintiff in error.

*Mr. John Feland* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This writ of error brings up for review a judgment of the Court of Appeals of Kentucky, affirming a judgment of the Circuit Court for Logan County, in that Commonwealth, in favor of the defendant in error against the Logan County National Bank, a banking association organized under the act of Congress.

The petition states that in June, 1879, the plaintiff Townsend sold to the bank, through Hugh Barclay, Jr., its cashier, $12,800 of the bonds of Logan County, Kentucky, issued in aid of the Owensboro and Russellville Railroad, with six months' interest accrued thereon, for the consideration of sixty-eight and one-half cents on the dollar, and of the promise and agreement of the bank that it would, upon plaintiff's demand, replace the bonds to him, at the same price, or less; that, relying upon such promise and agreement, he made the sale to the bank, and it refused to comply with its promise and agreement, although requested to do so. It also alleges that, at the commencement of the action, as well as at the time of plaintiff's demand, the bonds were worth, dollar for dollar, par and accrued interest; and that by reason of the refusal of the bank to comply with its promise and agreement the plaintiff has sustained damages in the sum of $4032, the difference between the price paid by it for the bonds and

their par value, and $384, the amount of six months' accrued interest. The prayer of the petition is for a judgment for damages in the sum of $4416, and costs, and all proper relief.

The defendant filed a general demurrer as well as an answer to the petition. The answer contains five paragraphs. In the first paragraph, it denies that the plaintiff at any time sold to it $12,800 or any other amount of the bonds of Logan County; in the second, that it ever promised or agreed with the plaintiff that it would replace any bonds sold by him, at any price, on demand or at any time; and in the third, that he ever sold the bonds to its cashier for and on its account. It avers in the fourth paragraph that, in June, 1879, and before and after, Barclay was engaged on his own account in an effort to depress the value of the bonds, and to that end endeavored to induce the Logan County court, composed of the county judge and justices of the peace, to refuse to levy a tax to pay interest on them; that the plaintiff then and there owned the bonds in question; that he and Barclay, in furtherance of their personal ends, conspired to prevent a levy, agreeing that plaintiff should use his personal influence with one of the justices to prevent him from ruling in favor of one, and should allow Barclay to sell the bonds, with bonds owned and controlled by him, at a price determined on; that Barclay was to guarantee, and did guarantee, that, as a result of such sale, the value of the bonds of the county would be reduced, so that the plaintiff could buy the same amount at a price less than that at which Barclay was to sell the plaintiff's bonds; that said bonds were reduced in value, by or after their sale, far below the agreed price, so that plaintiff could at any time during the succeeding month have purchased the same amount at much less than he received for those sold for him by Barclay; that Barclay deposited the proceeds of the bonds in the defendant's bank to the plaintiff's credit, and the entire amount thereof was paid out on the plaintiff's checks; and that defendant was in no way connected with the transaction, otherwise than that, Barclay having deposited such proceeds in the bank, it paid them to the plaintiff.

It is averred in the fifth paragraph of the answer that

Barclay had no authority, right or power to make for or on account of defendant the contract set out in the petition; that defendant had itself no right, power or authority to make it; and that it was a mere gambling transaction, a mere dealing in and betting upon the future value of the bonds, and unauthorized by the defendant's charter or by law.

The general demurrer to the petition was overruled. The plaintiff filed a demurrer to the fourth and fifth paragraphs of the answer, which was overruled as to the former and sustained as to the latter.

The plaintiff filed a reply to the third and fourth paragraphs of the answer, denying all the allegations of each, and charged that Barclay was engaged in June, 1879, and after that time, in an effort to depress the value of bonds, not on his own account, but as cashier and director of the bank, with its knowledge and consent, the bank endeavoring to enrich itself by depressing the value of the bonds of the county. To this reply the bank filed a rejoinder.

The jury returned a general verdict for the plaintiff, and also made a special finding in answer to specific questions. In response to the question, " Did Townsend sell the bonds to the defendant bank or to Hugh Barclay, Jr.," the jury answered, " To defendant bank; " and to the question " What was the contract made at date of sale," the answer was, " That defendant would replace the bonds to plaintiff at the price paid at that time or less."

Among other instructions given to the jury for the plaintiff was the following: " The court instructs the jury that if they believe from a preponderance of the proof that the plaintiff Townsend sold to the defendant, the Logan County National Bank, the bonds mentioned in the petition, and the defendant agreed and promised on demand to return the bonds to the plaintiff at the price paid, or less, and upon demand refused to do so, they must find for the plaintiff the difference between the price paid and the value of the bonds at the time the demand was made." The court refused to give the following instruction asked by the bank: " That the defendant is a national banking association, capable of exercising only such

powers as are expressly or impliedly conferred upon it by its act of incorporation, and that the power to buy and sell municipal bonds for purposes of speculation, or to engage in the purchase or sale of such securities for the purpose of manipulating or controlling their market value, is not conferred upon the defendant bank by the provisions of its charter; and that if the jury believe from the evidence that the cashier Barclay paid Townsend the full market value for his bonds, and bought them for the sole purpose of enabling him or the bank to manipulate or control the price of said bonds in the market for speculative purposes, they must find for the defendant, provided that they shall believe that the plaintiff at the time knew that the bonds were to be used for such purposes." Other instructions were given and refused, but none of them distinctly involved the question of the liability of the defendant to the plaintiff under its charter and the act of Congress relating to national banking institutions.

The Court of Appeals of Kentucky thus disposed of that question : " The last ground is that the contract is *ultra vires* the corporate authority of the bank, in direct violation of its charter, and, consequently, is not such an obligation as will charge the bank or make it to any extent, either in law or conscience, liable in damages or otherwise for breach of the conditions. It seems to us that if the proposition be conceded it would not avail appellant, for if it had no authority under its charter to purchase the bonds it cannot, in justice and conscience, refuse to abide by the judgment in this case, which involves nothing more than the return of the bonds and receipt of what it paid for them. To do less cannot be justified without permitting it to profit by its own wrong in violating the law of Congress under which it exists. Probably according to a fair construction of the national bank act, the power is not expressly given to appellant to purchase and deal in bonds of the character in question ; but neither is it expressly prohibited by the act to do so, and there is a proper and well recognized difference between ' the case of an engagement made by a corporation to do an act expressly prohibited by its charter or some other law and a

case where legislative power to do the act has not been granted.' See *Hitchcock* v. *Galveston*, 96 U. S. 341, and numerous authorities there cited. In that case the following from the *State Board of Agriculture* v. *The Citizens' Street Railway Co.*, 47 Indiana, 407, was quoted with approval: ' Although there may be a defect of power in a corporation to make a contract, yet if a contract made by it is not in violation of its charter or of any statute prohibiting it, and the corporation has by its promise induced a party relying on the promise, and in execution of the contract, to expend money and perform his part thereof, the corporation is liable on the contract.' If the special findings of the jury in this case be taken as true, there needs no argument to show that the rule thus laid down applies to the contract we are considering, and to adopt the opposite of that rule would invite a disregard of the provisions of the national bank act, as well as fraud and bad faith towards those dealing with a corporation existing under it.''

Upon the question raised by the defendant in error as to the jurisdiction of this court, it is sufficient to say that the fifth paragraph of the answer, to which a demurrer was sustained, and one of the defendant's requests for instructions, which was refused, proceeded alike upon the ground that the bank was forbidden by the national banking act to make the contract or agreement set out in the petition, and, consequently, that it was exempted from liability to the plaintiff upon any ground whatever. The exemption or immunity thus specially set up in the court of original jurisdiction, and reasserted in the Court of Appeals of Kentucky, having been denied by the judgment, the authority of this court to reexamine that judgment, so far as it determines that no such exemption or immunity as that claimed by the bank, under the act of Congress, exists, is entirely clear. That the Court of Appeals of Kentucky may have held the bank liable independently of the question whether the act of Congress forbade or did not forbid a national bank from making such a contract as the petition recites, does not show a want of jurisdiction in this court; for the defendant's contention was, and

is, that consistently with the act of Congress it cannot be held liable to the plaintiff upon any ground. So that the judg-ment necessarily determined, adversely to the bank, that it had no such exemption or immunity as it asserts in virtue of the national banking act. It is not a case — if the bank be right in its contention — in which the judgment can rest upon some ground of general law, adverted to by the state court, and sufficiently broad to support it without reference to the act of Congress as interpreted by the bank. We must, there-fore, inquire whether the act of Congress protects the bank from liability to the plaintiff in any aspect in which his claim may be regarded.

Whether the agreement set out in the petition for the sale of the plaintiff's bonds was made by the cashier of the bank upon his individual account, or for the bank, is not a question before us. That was conclusively determined by the finding of the jury. We have no authority to review the finding upon that point, and must assume, in conformity with the finding, that the bonds were sold by Townsend to the bank, at a given price, and that the bank agreed to replace them to him at the same or a less price, upon demand.

It is undoubtedly true, as contended by the defendant, that the national banking act is an enabling act for all associations organized under it, and that a national bank cannot rightfully exercise any powers except those expressly granted by that act, or such incidental powers as are necessary to carry on the business of banking for which it was established. The statute declares that a national banking institution shall have power "to exercise, by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by dis-counting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security; and by obtaining, issuing and circulating notes according to the provisions" of Title 62 of the Revised Statutes.

Now, the contention of the bank is that the purchase of the

bonds in question, at a named price, under an agreement to replace them to the plaintiff at the same or a less price, upon the demand of the plaintiff, was not banking business in any proper or legitimate sense; certainly not of the kind it was authorized by the statute to conduct. In the view we take of this case, it is unnecessary to determine that question, or to discuss the authorities cited to show that such a contract as the one set out in the petition is not embraced by any of the clauses of the statute specifying the different modes by which a national bank may carry on the business of banking. If it be assumed, in accordance with the bank's contention, that it was without power to purchase these bonds, to be replaced to the plaintiff, on demand, the question would still remain, whether, notwithstanding the act of Congress defining and limiting its powers, it was exempt from liability to the plaintiff for the value of the bonds, if it refused, upon demand, to replace or surrender them at the same or a less price.

It would seem, upon defendant's theory of its powers, to be too clear to admit of dispute that the act of Congress does not give a national bank an absolute right to retain bonds coming into its possession, by purchase, under a contract which it was without authority to make. True, it is not under a duty to surrender possession until reimbursed the full amount due to it; it has the right to hold the bonds as security for the return of the consideration paid for them; but when such amount is returned, or tendered back to it, and the surrender of the bonds is demanded, its authority to retain them no longer exists. And from the time of such demand and its refusal to return the bonds to the vendor or owner, it becomes liable for their value upon grounds apart from the contract under which it obtained them. It could not rightfully hold them under or by virtue of the contract, and at the same time refuse to comply with the terms of purchase. If the bank's want of power, under the statute, to make such a contract of purchase may be pleaded in bar of all claims against it based upon the contract — and we are assuming, for the purposes of this case, that it may be — it is bound, upon demand, accompanied by a tender back of the price it paid, to surrender the

bonds to its vendor. The bank, in this case, insisting that it obtained the bonds of the plaintiff in violation of the act of Congress, is bound, upon being made whole, to return them to him. No exemption or immunity from this principle of right and duty is given by the national banking act. " The obligation to do justice," this court said in *Marsh* v. *Fulton County*, 10 Wall. 676, 684, " rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independently of any statute, will compel restitution or compensation." " This," it was further said, "is a very different thing from enforcing an obligation attempted to be created in one way, when the statute declares that it shall only be created in another and different way." Upon this obligation to do justice rests the decision in *Louisiana* v. *Wood*, 102 U. S. 294, 298, 299, where this court held a municipal corporation liable to an action for money received on bonds issued by it, and which, being issued without authority of law, were invalid. The money it got was paid to it in the belief that the bonds were valid obligations of the corporation, and, therefore, was paid by mistake. After citing *Moses* v. *Macferlan*, 2 Burrow, 1005, in which it was said that an action lies for money paid by mistake, or upon a consideration which happens to fail, or for money got through imposition, and also, *Marsh* v. *Fulton County*, the court, speaking by Chief Justice Waite, said that the law implied from what was done, a contract " that the city would, on demand, return the money paid to it by mistake, and, as the money was got under a form of obligation which was apparently good, that interest should be paid at the legal rate from the time the obligation was denied."

So, in *Parkersburg* v. *Brown*, 106 U. S. 487, 503, involving the liability of a municipal corporation upon bonds issued in its name and secured by deed of trust given by the person to whom they were loaned, and which bonds were held to be void for want of authority to execute them — the court said: " But, notwithstanding the invalidity of the bonds and of the trust, the O'Briens had a right to reclaim the property and to call on the city to account for it. The enforcement of such

right is not in affirmance of the illegal contract, but is in dis-affirmance of it, and seeks to prevent the city from retaining the benefit which it has derived from the unlawful act. 2 Com. Cont. 109. There was no illegality in the mere putting of the property by the O'Briens in the hands of the city. To deny a remedy to reclaim it is to give effect to the illegal contract. The illegality of the contract does not arise from any moral turpitude. The property was transferred under a contract which was merely *malum prohibitum,* and where the city was the principal offender. In such a case the party receiving may be made to refund to the person from whom it has received the property for the unauthorized purpose, the value of that which it has actually received," citing *White* v. *Franklin Bank,* 22 Pick. 181 ; *Morville* v. *American Tract Society,* 123 Mass. 129, and *Davis* v. *Old Colony Railroad,* 131 Mass. 258, 275. See also *Hitchcock* v. *Galveston,* 96 U. S. 341, 351 ; *Chapman* v. *County of Douglas,* 107 U. S. 348, 356, 357 ; *Salt Lake City* v. *Hollister,* 118 U. S. 256, 263 ; *Clark* v. *Saline County,* 9 Nebraska, 516 ; *Pimental* v. *San Francisco,* 21 California, 351, 362.

We have said that the bank could hold the bonds, even if obtained by it without authority of law, as security for the money advanced to the plaintiff for them. This is only an application of the principle announced by this court in several cases involving the validity of transactions by national banks. In *National Bank* v. *Matthews,* 98 U. S. 621, it appeared that a national bank loaned money upon the security of a note and a deed of trust of lands, both of which were assigned to it. The statute declared that a national banking association could loan money " on personal security," and could purchase, hold and convey real estate for certain named purposes, " and for no others," among which was not included the securing of a present loan of money by a deed of trust or mortgage on real property. The court, while assuming that the statute, by clear implication, forbade the bank from making a loan on real estate, refused to restrain the bank from enforcing the deed of trust. The decision went upon these grounds: That the bank parted with its money in good faith; that the ques-

tion as to the violation of its charter, by taking title to real estate for purposes unauthorized by law, could be raised only by the government in a direct proceeding for that purpose; and that it was not open to the plaintiff in that suit, who had contracted with the bank, to raise any such question in order to defeat the collection of the amount loaned. If any doubt existed as to the scope of the decision in that case, it was removed by *National Bank* v. *Whitney*, 103 U. S. 99, where it was held that the right of a national bank to enforce a mortgage of real estate taken by it to secure indebtedness then existing, as well as future advances, could not be questioned by the debtor, and that a disregard by the bank of the provisions of the act of Congress upon that subject only laid the association open to proceedings by the government for exercising powers not conferred by law.

The bank having then the right to hold the bonds until reimbursed for its advances, but being bound, upon implied contract, to return them, on demand, when repudiating as illegal the agreement under which it got them, the next inquiry is as to the amount for which it may be held liable upon its refusing to surrender them to the plaintiff. In considering this question we assume that the bank had the bonds in its possession as well when this action was brought as when it declined to comply with the plaintiff's demand for the contract. It is neither alleged nor proved that it had disposed of the bonds prior to such demand. The jury found that it purchased the bonds, and, the contrary not appearing, the presumption was that it held them even at the commencement of the action. The amount found in plaintiff's favor was the difference between the price paid by the bank and the value of the bonds at the time the plaintiff demanded compliance upon its part with the alleged contract. The result is substantially the same as if the plaintiff had tendered back the amount received from the bank and demanded a return of the bonds or their value; in which case it would have been liable for the value of the bonds, at least, at the time of the demand. It is unnecessary to discuss the conflicting decisions as to the general rule defining the proper measure of damages

where personal property is wrongfully detained. If the proof showed that the bonds were of greater value at or before the time of trial than at the time of the demand for their return, a different question would be presented. *Galigher* v. *Jones*, 129 U. S. 193, 201. In this case it appears that there was no difference in their value at those respective dates. The bank, if liable at all, is certainly liable, in this case, for the value of the bonds at the time it refused, upon demand, to restore them. It was not in default, under the alleged contract, until the plaintiff's demand for its performance; for until then its possession of the bonds was with his consent. Until demand, the plaintiff had not manifested his will to have them restored to him. The conversion occurred when the defendant repudiated all obligation to perform the contract or denied that any such contract was ever made, and yet held on to the bonds as its property. We say held on to them, because the jury has found, and we must take it to be true, that the bank, and not Barclay on his individual account, purchased them.

Our conclusion upon the whole case, so far as the questions arising in it may be reviewed by this court, is, that if the bank had no authority to purchase the bonds in question, it is yet not exempt, by reason of anything in the national banking act, from liability to the plaintiff for the difference between the price it paid for them and their value at the time it refused, upon plaintiff's demand, to comply with the contract made by it for their purchase and held on to the bonds.

*Judgment affirmed.*