United States Fidelity Co. *v.* First State
Bank et el.

[76 South. 747.]

1. COUNTIES. *Sale of road bonds. Obligation of buyer. Payment.*

It is the duty and obligation of bond buyers to pay for bonds in actual money, in the absence of an express statute authorizing the taking of something other than money in payment of bonds. but where a check is accepted in payment and actually paid into the proper depository of the county, it will be treated as payment.

2. COUNTIES. *Sale of road bonds. Payment by notes.*

A county depository was not authorized to take as payment for road bonds the individual notes of its offices, held by the purchaser.

3. COUNTIES. *Sale of road bonds. Payment by checks.*

Where a state bank, being a county depository, received a bond issue of a road district of the county, for delivery to a purchaser. and received a check from the purchaser an an advance payment and the check was afterwards paid, this constituted a payment on the bond purchase.

4. SUBROGATION. *Principal and surety.*

Where a county depository, after delivering bonds to a purchaser without full payment of the purchase price became insolvent, and its surety as such depository paid the county the balance due, in such case the surety was entitled to be subrogated as

against the purchaser of the bonds, to the extent of the amount still unpaid to the depository for the purchase price of the bonds.

5. BANKS AND BANKING. *National banks. Ultra vires contracts.*

A national bank cannot be held liable for acts in excess of its charter powers and such bank is not estopped to plead *ultra vires* in defense of any unlawful contract.

6. SAME.

A national bank that executes a contract even beyond its powers, but receives funds or property by virtue of such contract, is liable to the extent that it has received funds or property or has received benefits from such *ultra vire* contract.

7. BANKS AND BANKING. *National banks. Powers. Indemnity.*

Where a state bank being unable to make the bond required as a county depository a national bank procured a surety for it, and in consideration of the execution of the bond, the national bank agreed with the surety to have all funds covered by the bond deposited by the state bank with it, and to execute certificates of deposit and cause the same to be indorsed to the surety, to be held as collateral, and in the event of the failure of the state bank to pay, etc., to indemnify the surety against all loss. In such case the contract was not beyond the powers of the national bank under Rev. St. U. S., section 5136, (U. S. Comp. 1916, section 9661), with reference to the powers of national banks.

8. BANKS AND BANKING. *Title to funds. Duty of surety*

Where a national bank, having undertaken to cause money sent to it by a state bank received under a depository bond to be handled in a particular way calculated to safeguard the surety on the depository bond, it cannot escape liability on the theory that it did not receive notice that a second bond issue had been made, or that the funds received by it from the state bank were funds belonging to the road district since in assuming this obligation, it assumed an obligation to keep in touch with the affairs of the depository and to know the character of the funds it received from the depository.

APPEAL from the chancery court of Calhoun county. HON. J. G. McGOWAN, Chancellor.

Suit by the United States Fidelity & Guaranty Company against the First State Bank, S. S. Harris, receiver, and others in which certain parties filed cross-bills. From the judgment rendered, plaintiff appeals.

In 1914 the First State Bank of Pittsboro, being a corporation under the laws of Mississippi, desiring to become a depository of the county of Calhoun, under the laws of the state made its bid for the public money as a county depository, but was unable to make the depository bond on its own financial standing. Having carried an account with the National City Bank of Memphis for several years, an agent of the First State Bank applied to the National City Bank of Memphis to assist it in securing a bond, and as an inducement proposed to deposit the money received as a county depository with the National City Bank of Memphis. The National City Bank of Memphis was anxious to secure the deposit, and went with the agent of the First State Bank to the offices of the United States Fidelity & Guaranty Company and induced that Company to make the surety bond for the First State Bank, entering into a contract with the surety company, which contract recited that the National City Bank of Memphis was desirous of having the First State Bank of Pittsboro, Miss., qualify as a depository for the road funds of district No. 1 of Calhoun county, Miss., and that the First State Bank desired to deposit said fund with the said National City Bank, further reciting that a surety bond for the sum of twenty-three thousand dollars would have to be made under the laws of the state of Mississippi, and that the surety company had been applied to at the instance and request of the National City Bank, and had agreed to execute said bond on behalf of the First State Bank on condition that said National City Bank indemnify the United States Fidelity & Guaranty Company against all loss, cost, and expense that it may incur or suffer by reason of the execution of said bond, and then recited as follows:.

"Now, therefore, the National City Bank, in consideration of the execution of said bond on behalf of the First State Bank and the benefits moving to it or accepted by it from said arrangement, does hereby agree to have all said funds covered by said bond deposited by the First

State Bank with it, and to execute a certificate or certificates of deposit in favor of the said First State Bank for all such funds, and cause the same to be indorsed over to the said United States Fidelity & Guaranty Company, to be held by it as collateral security against loss, and in the event of the failure of said First State Bank to pay on demand to said United States Fidelity & Guaranty Company, or its assigns, the amount thereof for settlement with the obligee, or its representatives made under said bond, or to reimburse the said United States Fidelity & Guaranty Company, if it shall already have made such settlement, and otherwise to indemnify and keep indemnified said United States Fidelity & Guaranty Company against all loss, cost, and expenses, which it may suffer or incur because of its execution of and suretyship on said bond, including counsel or attorney's fees in any action hereunder.''

This contract was signed by the National City Bank, by its president, and by the United States Fidelity & Guaranty Company, by its attorney in fact, and the said contract was ratified or approved by W. H. Kyle, cashier, and J. M. Speed, R. E. Bodine, and J. M. Tuther, executive committee, of the National City Bank. Thereupon the United States Fidelity & Guaranty Company executed the surety bond of the First State Bank of Pittsboro as depository for said public funds of Calhoun county, and the bank qualified as county depository. District No. 1 of Calhoun county issued road bonds and sold them to parties not involved in this suit, which said funds were paid to the First State Bank as depository, and by it deposited in the National City Bank and paid out by the said National City Bank according to its terms with the United State Fidelity & Guaranty Company and the contract above mentioned. This first bond issue was made in January, 1914. At the July meeting of the board a second bond issue for said road district was authorized, and bonds ordered issued and sold to one G. W. Cole, one of the appellees, at and for the sum of fifteen thousand

one hundred and two dollars, being a premium of one hundred and two dollars, on the face of the bonds. The cashier of the First State Bank represented Mr. Cole in buying these bonds, and the First State Bank having previous to the sale of the bonds and in the month of May 1914, borrowed from G. W. Cole the sum of six thousand dollars, giving the notes of the officers of the bank individually for such debt. The First State Bank was anxious to have Mr. Cole, or some one friendly to the bank, buy said bond issue, and as an inducement to Cole to buy the bonds proposed to pay the premium and the accrued interest on the bonds, making the bonds cost Cole face value.

The bond issue and proceedings thereunder was referred to Woods & Oakley, bond attorneys at Chicago, Ill., for an opinion and approval as to their validity, and while the bonds were being investigated, and before they were executed and delivered to Cole, the First State Bank, desiring further moneys, approached Mr. Cole for a payment of three thousand dollars in advance of the delivery of the bonds, and Mr. Cole gave the bank his check for said sum and took the personal notes of the officers of the bank as security or evidence evidencing the payment of said money, and this three thousand dollar payment was sent to the National City Bank of Memphis with other items, but without any express notice that the three thousand dollars was a payment on the bond issue; Mr. Cole's check being drawn on the Bank of Okolona and collected by the National City Bank and applied to the credit of the First State Bank, and afterwards checked out by the First State Bank in the regular course of business. The bonds were delivered to Cole in September, 1914, at which time he paid one thousand dollars in cash, which was used by the First State Bank on its own account, and gave his check for four thousand four hundred ninety three dollars and twenty cents, and surrendered to the bank the note for six thousand dollars and interest and the note for three thousand dollars, and

another note for about three hundred and fifty dollars, which had been given in payment of Mr. Cole's attorney for making an investigation of the loan for the six thousand dollars. Mr. Cole was given a receipt for the full amount of the bonds, premium, and interest by the county treasurer; said receipt being given in the First State Bank, in the presence of the cashier and Mr. Cole, on the representation of the cashier that Mr. Cole had paid this amount of money into the bank. The four thousand four hundred and ninety three dollars and twenty cents was evidenced by a check of Mr. Cole, which was sent to the National City Bank, being drawn on the Bank of Okolona, Miss. and was collected by the said bank and paid out in due course of business; said National City Bank not being personally notified at the said time that the said moneys or any of them were for payment on the bonds.

In October, 1914, the state bank examiner, S. S. Harris, took charge of the said bank for liquidation, it being found in an insolvent condition, and at said time there was only one hundred and sixty two dollars of said road funds remaining in the bank; the bank having used said funds in its business as a bank, and not in payment of warrants of the road district. The County of Calhoun made demand upon the United States Fidelity & Guaranty Company to replace said moneys making good said expenditures, and the United States Fidelity & Guaranty Company gave notice to the National City Bank and demanded that it pay said amount under its contract with the Guaranty Company. This the National City Bank refused to do, setting up that said contract was *ultra vires*. Thereupon suit was brought by the United States Fidelity & Guaranty Company in the chancery court of Calhoun county, making the National City Bank of Memphis, First State Bank of Pittsboro, and the receiver thereof, and G. W. Cole, and the road district commissioners, parties defendant thereto, and praying that an accounting be made by Calhoun County,

and praying that it be allowed to pay the said amounts found to be due, and to be subrogated to the rights of the county against G. W. Cole and the First State Bank, and praying for a judgment against the National City Bank for whatever moneys and expense it had incured by reason of the said loss and insolvency of the said First State Bank.

The county filed its answer, disclosing the amount due to it. G. W. Cole filed an answer and cross-bill, setting forth that in making the loan for six thousand dollars, and in surrendering the note for three hundred and fifty dollars and the note for three thousand dollars, he had surrendered to the bank collateral pledged to him to secure his indebtedness, which was good and solvent paper and amounting to more than the total sum of his indebtedness against the bank, and contended that the surrender of said notes constituted a payment of the bonds, but, if mistaken in this, that he be returned the collateral and awarded the proceeds of such notes as have been collected by the bank or state bank examiner in liquidating said bank to be applied to his indebtedness. The bank examiner filed an answer, setting forth that the loan made by Cole was not made to the bank, but was made to individuals, and that the bank was not responsible for said loan, and demanded payment of the balance of the purchase money on said bonds, making its answer a cross-bill. The National City Bank filed an answer, admitting the principal allegations of the bill, other than to its contract and to its liability, pleaded that it was not liable on any contract made by its officers or agents, and that the contract made and exhibited to the bill of complaint was *ultra vires* and void, and that the bank was not in any manner responsible therefor. It further set up in its answer that the funds received on the last bond issue above mentioned were received in the ordinary course of business for the personal account of the First State Bank, and that it had no knowledge that

said funds or any part thereof were proceeds of a bond issue, and had no knowledge that there was a second bond issue, and disclaimed liability altogether.

N. R. Lamar testified that he went to Memphis, representing the First State Bank, and that he took up the matter with its cashier, Mr. Kyle, with reference to becoming a depository, and that Mr. Kyle went with him before the board of directors of the National City Bank, and that the cashier and directors agreed that, if the deposit would be placed with them, they would assist in procuring a bond for the depository, and that they went to the offices of the United States Fidelity & Guaranty Company and made an arrangement by which the Guaranty Company became surety of the First State Bank, and that the funds for the first bond issue were placed with the National City Bank. Mr. Lamar thereafter retired from the First State Bank and was not connected with it at the time of the second bond issue. The National City Bank offered no testimony, other than the testimony of its bookkeeper, who testified as to the accounts between the First State Bank and the National City Bank, and testified that so far as he knew the bank had no notice of the issue of the second bond issue or that the funds sent to it were the funds derived from the sale of such bond issue. The testimony produced on the hearing is voluminous, but supports the facts as herein stated. Mr. Cole testifies that he had no knowledge of the insolvency of the First State Bank at the time of this transaction, and that he surrendered his notes at the request of the bank, and that he considered doing so an accommodation to the bank, as he was satisfied with his notes and securities for the amount of money which he had let the bank have. There are circumstances in the record which tend to show that the bank was hard pressed for money and would cause a reasonably prudent man to apprehend that the bank was not in good condition.

The chancellor entered a decree, in which he adjudged that the county of Calhoun and the road district commissioners were not entitled to recover of G. W. Cole anything on account of the said transactions, and that S. S. Harris, receiver of the First State Bank, was not entitled to recover on his cross-bill against Cole, and that the said original bill of the appellant and the cross-bill of S. S. Harris were dismissed as to Cole, but adjudged that Calhoun county is entitled to recover for the road commissioners of road district No. 1 from the First State Bank and the surety on its depository bond, and the appellant, the sum of fifteen thousand and five hundred dollars, and an attorney's fee of one thousand, and six hundred dollars, making a total of seventeen thousand and two hundred dollars, and all costs, and recited that said money was paid into court, and that the United States Fidelity & Guaranty Company is subrogated to the rights of the county and the road commissioners, but was not entitled to be paid first out of the assets of the First State Bank in preference to other creditors of the bank, and should not be entitled to have the notes and collateral turned over to the First State Bank by Cole treated as a trust fund for its benefit, and adjudged that the Guaranty Company was entitled to judgment over against the National City Bank of Memphis, Tenn., for the balance due the First State Bank on certificate of deposit, with four and one fourth per cent. interest from the 16th day of October, 1914, to the date of the judgment, aggregating a total of four thousand eight hundred and twenty-five dollars and sixteen cents, with six per cent. interest thereon and thirty per cent. of the attorney's fee of one thousand six hundred dollars, from which judgment the United States Fidelity & Guaranty Company took an appeal, and S. S. Harris and the National City Bank also took cross-appeals, to this court.

*W. M. Hall,* for appellant.

The real question then before the court below was whether the Guaranty Company could disaffirm the Bank's unauthorized act and require Cole to pay cash.

As an abstract, general proposition, it may be true that no one except the principal could repudiate the unauthorized act of the agent, but it must not be forgotten what the situation of the parties was, and what tribunal they were in. All parties in interest were before the court, and the court was a court of equity. Equity looks through form to substance and makes immediately liable him who is ultimately liable, and thus prevents wrongs otherwise unavoidable. Storey Equity Jurisprudence, sec. 1250; *Smith* v. *Peace,* 1 Lea (Tenn.), 585.

The Guaranty Company was in effect made the guarantor of the First State Bank's debt to Cole, because when it took its own notes it became in effect guarantor that the First State Bank would have the cash equivalent to the county's credit, Mr Cole necessarily knew from the Bank's importunities for money that it did not have the cash equivalent to put up, nor can it be said that the cash, if paid, would not have gone to the National City Bank, and the Guaranty Company have been thus protected, for the evidence shows clearly that all the cash received, except the sum of one thousand dollars, actually went to the National City Bank, and it is only inferable from this that the amount of these notes, if paid in cash, would also have gone to the National City Bank under the arrangement between the two banks and the Guaranty Company.

In anticipation of the suggestion that Mr. Cole could have paid the cash to the Bank, and the Bank could have turned right around and taken up the notes out of its augmented cash, we will say that the suggestion throws no light on our proposition, because that was not done, and we are only concerned with the legal effect of what was done.

The county was without authority to ratify such a transaction, because the law contemplates such bonds being sold for money. If the county could not ratify the unauthorized act of its agent, then it was under the necessity to disaffirm. The guaranty company under the law was entitled to be subrogated to all the county's rights. Code, sec. 3733. The county, therefore, being under the necessity of disaffirming, and to subrogate the Guaranty Company to its rights upon what principle can the Guaranty Company in a court of equity which makes immediately liable him who is ultimately liable, be denied the justice of the county's disaffirming its agents unauthorized act.

We come now to the next question. If the county could not be required to disaffirm, it must follow that the agent's act was ratified, and that the county thereby became entitled to those notes taken in lien of cash. 2 Michie Banks & Banking, sec. 161, (3) p. 399; National Life Ins. Co. v. Mather, 118 Ill. App. 491; 2 Story in Eq. Juris, sec. 1258.

Now, if the county was entitled to those notes, as it undoubtedly was, the Guaranty Company, when it became subrogated to the county's rights, as it was expressly by the court's decree, became entitled to the notes.

But at this point the receiver of the First State Bank steps in and says in opposition to this that this would give the Guaranty Company a preference, which the supreme court said in Potter v. Fidelity & Deposit Co., 101 Miss. 823, the surety on a depository bond was not entitled to.

That proposition is not tenable, because the trust does not arise from Code, sec. 3485. The Potter case does not in any view militate against the Guaranty Company's contention. Really it could be forcibly argued that the Guaranty Company is entitled to a preference to the extent of the amount of the notes, under Code, sec. 3485, for the simple reason that Cole's deposit with the First

State Bank as depository was unlawful, in view of the depository law's requirement that money shall be paid in, and paid in pursuance of warrants issued by the chancery clerk. Acts 1912, chap. 1914, sec. 6, p. 210. The court will recall that the right to the preference under section 3485 was predicated upon the unlawfulness of the deposit of public funds in *Fogg* v. *Bank,* 80 Miss. 750; *Metcalf* v. *Bank,* 89 Miss. 649; *Bank* v. *Hardy,* 97 Miss. 755; *Green* v. *Cole,* 98 Miss. 67, whereas the denial of the preference in the Potter case was because the funds under the depository law were legally deposited, being in pursuance of express authority.

We submit in view of this, that the Guaranty Company should have had a decree against Cole for the amount of the three notes.

Claim against National City Bank. This leads to the next question whether the National City Bank's contract with the Guaranty Company is *ultra vires* and void. For the purpose of eliminating from our equation we might as well at this point concede that a National Bank has no power to lend its credit to any person or corporation or become guaranty of the obligations of another for the sole accommodation of the other.

It will be manifest to the court from reading the testimony of N. R. Lamar, Cashier of the First State Bank at the time the depository bond was obtained from the Guaranty Company and of L. L. Bebout, assistant manager of the Guaranty Company that the National City Bank's so-called guarantee or indemnity was in furtherance of its own business, and not an accomodation for the sole benefit of the First State Bank.

It will be apparant from reading Mr. Lamar's testimony that the National City Bank was anxious to get the use of these road funds at the stipulated price, and that it was anxious for the First State Bank to qualify as depositor in order that it might get the funds.

The National City Bank has the power to borrow money. 4 Michie, Banks & Banking, p. 1981. It also undoubtedly had the right to receive deposits, 3 Michie, Banks & Banking, sec. 263, p. 2035. It was also within the power of the bank to give a bond to secure deposits. 3 Michie, p. 2026.

Now let it be noted carefully what the National City Bank's undertaking really was. It was primarily an undertaking on its part to get the road funds from the First State Bank on deposit with its bank, and pay out these moneys only in a certain way.

In 3 Michie, p. 2026, it is laid down as follows: "The power conferred upon National Banks to receive deposits neccessarily carries with it the power to contract as to the parties to whom the deposit shall be repaid."

In support of this is cited *Sykes* v. *First National Bank*, 2 S. Dak. 242, 49 N. W. 1058, in which it is held that where money is deposited in a National Bank under a contract obligating the bank to pay it to a third person on the performance of certain work by the latter, the bank cannot, after the performance of the work, object to the payment of the money to the person entitled thereto on the ground that the National Banking act did not empower it to enter into such a contract. See, also, *Bushnell* v. *Chataqa Co. Nat. Bank*, 10 Hun. (N. Y.) 378.

The bank actually received on deposit the proceeds from the first installment of road funds to which the contract had reference, and handled the same in accordance with the agreement, and at the time suit was filed had on hand of that installment a balance of seventy-nine dollars and twenty-seven cents, or with interest added at the stipulated rate, eighty-four dollars and twenty-seven cents.

The bank also actually received from the second installment of road funds, three thousand dollars and four thousand, four hundred and ninety three dollars and twenty cents, or a total of seven thousand four hundred and ninety-three dollars and twenty cents.

Th'at the bank was liable for what it actually received, if it was not liable for more, cannot be doubted. *Citizens National Bank* v. *Appleton*, 216 U. S. 196, ˙54 L. Ed. 443; See 20 L. R. A. 765; Age 35 L. Ed. 55; *First National Bank* v. *Anderson*, 172 U. S. 573, 43 L. Ed. 558; *McCormick* v. *Market Nat. Bank*, 165 U. S. 538, 41 L. Ed. 817; *Emerling* v. *First National Bank*, 38 C. C. A. 399, 97 Fed. 739; *Am. Nat. Bank* v. *National Wall-Paper Co.*, 23 C. C. A. 33, 77 Fed. 85; *Hutchins* v. *Planters National Bank*, 128 N. C. ˙72, 38 S. E. 252; *First National Bank* v. *Greenville Oil & Cotton Co.*, 24 Tex. Civ. App. 645, 60 S. W. 828; *Bushell* v. *Chataqua Co. Natl. Bank*, 10 Hun. (N. Y.) 378; *First Nat. Bank* v. *Priest*, 50 Ill. 321; *German National Bank* v. *Henry*, 159 Ala. 367, 49 So. 97. This second installment of funds was credited in the First State Bank's general checking account, and they were checked out by the First State Bank for purposes other than to pay road warrants. In other words, this second installment of funds was not handled by the National City Bank as provided by the contract.

This of course constitutes no answer to the Guaranty Company's demand for the money, because the National City Bank cannot take advantage of its own wrong.

*J. E. Holmes* and *Wilson & Armstrong*, for cross-appellant.

The powers of a national bank, are given and limited by the statute to "exercise by its board of directors or duly authorized officers of agents, subject to law all of such incidental powers as shall be necessary to carry on the business of banking, by discounting and negociating promissory notes, drafts, bills of exchange and other evidences of debt by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security and circulating notes according to the provisions of this title. Revised Statutes U. S., sec. 536; 5 Federal Statutes, Annotated Page, 82.

The business of banking which may be thus carried on, is therefore incidental to and is to be conducted by discounting and negociating promissory notes, drafts, and bills of exchange and other evidences of debt, by receiving deposits, by buying and selling exchange, coin and bullion, by loaning money on personal security, and by issuing circulating notes.

The grant of power of National Banks, just quoted is exclusive. They only have powers incidental to discounting and negotiating notes, receiving deposits, etc. · The failure to grant any other or further power to a National Bank; impliedly prohibits the exercise of further powers and they are therefore prohibited from doing any other character of business except those mentioned, such as discounting notes, receiving deposits, etc. *First National Bank of Charlottesville* v. *National Exchange Bank of Baltimore,* 92 U. S. 122, 23 L. Ed. 681; *Logan County Bank* v. *Townsend,* 139 U. S. 73, 107 L. Ed. 110, pamphlet page 2; *California National Bank* v. *Kennedy,* 167 U. S. 368, 42 L. Ed. 201, pamphlet page 7; *First National Bank* v. *Hawkins,* 174 U. S. 364, 43 L. Ed. 368, pamphlet, page 13.

The power of a National Bank and its officers to make a contract is a question dependent upon the charter rights of the bank. The power to make such a contract and the construction of its charter rights, is a construction of a charter granted by an Act of Congress and therefore a construction of such Act of Congress. The determination of such question is therefore necessarily a federal question. In determining such question and rights and construction, the Federal courts, by their decisions are controlling. They are all questions reviewable, by the supreme court of the United States. The decisions of that high tribunal, are controlling and conclusive. *McCormack* v. *Market National Bank,* 165 U. S. 548, 41 L. Ed. 544-547, pamphlet, page 19; *California National Bank* v. *Kennedy,* 167 U. S. 635, 42 L. Ed. 198, pamphlet page 7; *Talbot* v. *First National Bank of Sioux City,* 185 U. S. 192, 43 L. Ed. 862, pam-

phlet page 25; *Rankin* v. *Barton,* 199 U. S. 228, 50 L. Ed. 163, pamphlet page 31; *Merchants National Bank* v. *Wehram,* 202 U. S. 300, 50 L. E. 1040, pamphlet, page 33.

And the state courts follow the Federal rulings on the subject. *National Bank of Brunswick* v. *Sixth National Bank of Pennsylvania,* 61 Atl. 992; pamphlet page 37; *First National Bank* v. *American National Bank of Missouri,* 72 S. W. 1060, pamphlet page 41; *Appleton* v. *Citizens Central National Bank,* 190 N. Y. 418, 80 N. E. 471, pamphlet page 45.

A National Bank has no authority, express or implied, to enter into any contract of guaranty of the obligations of others, unless it is by endorsement and guaranty of paper owned by itself. A contract guaranty of the obligation of another bank or another institution, is *ultra vires* and void. *Seligman* v. *Charlottsville National Bank* (Circuit Court, Western District of Virginia), Judge Bond in Federal Cases, 12, 642, the leading case; *Bowen* v. *Neddles National Bank* (C. C. A. 9th circuit), 94 Fed. 95, 36 C. C. A. 553, pamphlet page 97. The supreme court of the United States affirmed this case on application for *certiorari,* 176 U. S. 682, 44 L. Ed. 637; *Commercial National Bank* v. *Pirie,* 82 Fed. 799, 27 C. C. A. 171, pamphlet page 49; *Merchants Bank of Valdosto* v. *Baird,* 160 Fed. 642, 90 C. C. A. 338, and note, pamphlet page 56; *Farmers & Merchants Bank* v. *Smith,* 77 Fed. 129, 23 C. C. A. 91, pamphlet page 61; *Appleton* v. *Citizens National Bank,* 190 N. Y. 418, 83 N. E. 471, 32 L. R. A. 544, pamphlet page 71; affirmed in *Citizens National Bank* v. *Appleton,* 216 U. S. 196, 54 L. Ed. 443, pamphlet page 46; *First National Bank* v. *American National Bank of Missouri,* 72 S. W. 1059, pamphlet page 41. This case reviews the authorities. *First National Bank* v. *Monroe* (Georgia), 69 S. E. 1123, pamphlet page 79; *Knickerbocker* v. *Wilcox* (Mich.), 47 N. W. 125, pamphlet page 81; *Thilmany* v. *Iowa Paper Bag Co.,* 79 N. W. 68, pamphlet page 86; *Norton* v. *Derry National Bank,* 61 New Hampshire 589, 60 Am. Rep. 334; *Fidelity &*

*Deposit Co.* v. *National Bank of Commerce* (Texas Court of Appeals), 106 S. W. 783, pamphlet page 90. This case reviews the authorities. *National Bank of Brunswick* v. *Sixth National Bank of Pennsylvania*, 11 Atl. 889, 212 Pa. St. 238, pamphlet page 37.

Neither the receipt of benefits nor the carrying out of the contract by the other party, can in any way estop a national bank from pleading that a contract made by it was *ultra vires* and void. The contract being beyond the power of the bank, it cannot ratify it nor be estopped to plead it. The contract is void because it is against public policy in subjecting the interest of the stockholders and creditors to unauthorized risks of loss, and no estoppel can make the contract good. This is the settled doctrine of the United States Courts and which is controlling. *Central Transportation* v. *Pullman's Palace Car Co.*, 139 U. S. 59, 60, 35 L. Ed. 68-69, pamphlet page 100; *McCormack* v. *Market National Bank*, 165 U. S. 538, 41 L. Ed. 817, pamphlet page 19; *California Natl. Bank* v. *Kennedy*, 167 U. S. 366, 42 L. Ed. 200, pamphlet page 7; *First National Bank* v. *Hawkins*, 174 U. S. 364, 43 L. Ed. 368, pamphlet page 13; *Merchants National Bank* v. *Wehrman*, 202 U. S. 300, 50 L. Ed. 1036, pamphlet page 33; *Citizens National Bank* v. *Appleton*, 216 U. S. L. 96, 54 L. Ed. 443, 83 N. E. 471, pamphlet pages 46-71; *Greenville Compress & Warehouse Co.* v. *Planters Compress Co.*, 70 Miss. 369, 13 So. 897, pamphlet page 113; *First Natl. Bank* v. *American Natl. Bank*, 72 S. W. 1059, pamphlet page 41; *Fidelity & Dep. Co.* v. *Natl. Bank of Commerce* (Texas Ct. of App.), 106 S. W. 783, pamphlet page 90.

The benefits from the illegal contract which are retained or have been converted by the bank to its own use, may be recovered on an implied contract to return them, but the contract itself has no life, force or validity. *Greenville* v. *Compress & Warehouse Co.*, 70 Miss. 669, 13 So. 879, pamphlet page 113; *Citizens National Bank* v. *Appleton*, 216 U. S. 196, 54 L. Ed. 443, 83 N. E. 471, pamphlet pages 46-71.

Even though the contract or act is within the power of the bank if it is out of the usual course of business and therefore extraordinary in its character, such as the borrowing of money, the officers of the bank have no implied authority to perform such act to make such contract. *Western National Bank* v. *Armstrong,* 152 U. S. 346, 48 L. Ed. 470, pamphlet page 136, and the authorities here cited, under paragraph, 4.

Conclusions. From these propositions of law and fact, it will be seen that the following contentions are made; I. The contract of indemnity and guaranty entered into in this case is void for two reasons: (A) It was out of the ordinary and usual course of business of the bank, and the officers who made it had no authority to make it. (B) It was not only out of the ordinary and usual course of business of the bank, but it, and every part of it are beyond the power of the bank to make, because it is prohibited impliedly by the Act of Congress which chartered the bank.

*W. D. & J. R. Anderson* and *J. R. West,* for appellee.

Did Cole make a legal payment for the bonds? In the first place we insist that the Guaranty Company is in no position to question the manner in which Cole paid for these bonds. The Guaranty Company we submit is estopped from raising any such question because its own liability was predicated on the idea that the proceeds of these bonds had been paid into this First State Bank. By the terms of its contract as surety the liability of the Guaranty Company was to insure that its principal, the First Bank would "faithfully account for, and in due and ordinary course of busines pay over, on legal demand, all moneys deposited with said principal by or on behalf of said obligee. If Cole had not made legal payment for the bonds, then it follows that the proceeds of the sale of the bonds had never been deposited with the First State Bank, and therefore the Guaranty Company never became liable.

We contend that the law in reference to the duties and responsibilities of a mere collecting agent to his principal

relied on by counsel for the Guaranty Company, has no application to the facts of this case. That was not the relation between the First State Bank and Calhoun county. The First State Bank did not occupy that relation. When these bonds were turned over to the First State Bank for settlement with Cole and settlement was made in the manner shown by the evidence, the relation of debtor and creditor existed as between the First State Bank and the County. *Potter* v. *Guaranty Co.,* 101 Miss. 823, O. C. 829-830, 58 So. 713; *Board of Levee Comr.* v. *Powell,* 68 So. 71, 69 So. 215; *Guaranty Co.* v. *Wilkerson County,* 109 Miss. 879, O. C. 888-889.

Everybody concerned in the proceedings of the sale of these road bonds considered what had taken place as a payment for the bonds. The county credited Cole with the payment of the bonds and so recited in its records. The depository treated it as a payment and so showed by its records. And we submit so far as the Guaranty Company is concerned there would be no liabiliay on its part if Cole did not legally pay for the bonds.

We submit it is not the law that Cole was required to pay for these bonds in actual legal tender currency of the United States. "Money" may mean not only legal tender coin or currency, but also any other circulating medium or instrument or token in general use in the commercial world as the representatives of value. If the law required that all bonds issued should be paid for in actual legal tender currency it would be utterly impossible to sell such bonds; in many instance it would be almost if not quite impossible to make payment for the bonds. *Bennett* v. *Bank of Commerce & Trust Co.,* 220 Fed.—;*Montgomery County* v. *Cochran,* 121 Fed. 17, 57 C. C. A. 261.

By its bill the Guaranty Company is seeking subrogation to the rights of the county; the creditor, not alone as against the First State Bank, the debtor, but against Cole, the alleged debtor of the First State Bank, the principal debtor for which the Guaranty Company was

surety. Subrogation is the substitution of another person in the place of creditor so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt. 37 Cyc. 363.

Now what was the right that the Guaranty Company succeeded to which was owned by the creditor the county? What right did the county have against Cole as to the purchase price of these bonds? The county had acknowledged payment by Cole; the depository had acknowledged payment, and the proceeds of the bonds were treated as in the hands of the county treasurer and in the depository. We submit that the county had no greater right against Cole than the First State Bank, and what right did the First State Bank have against Cole? Suppose the First State Bank had sued Cole for that part of the purchase price of these bonds which Cole paid by surrendering its notes. It looks plain that Cole would have had a perfect defense to such a suit. The First State Bank would not be permitted to repudiate the settlement it had made with Cole for the purchase price of these bonds. The rights of the parties stood exactly the same way after the insolvency of the First State Bank and while it was in the hands of the receiver. The receiver took the assets of the bank in the plight in which he found them. In a suit by the receiver against Cole to recover the purchase price of these bonds that is what we have here by the cross-bill of the receiver, Cole would be entitled if the court had held that his payment for the bonds was not legal, to offset against the claim of the receiver the indebtedenss he held against the bank. The fact of the insolvency of the bank could make no change in the principle of set-off and counterclaim. This principle is thoroughly settled by the adjudications of our court. Von *Wagoner* v. *Gas-Light Co.,* 23 N. J. Law, 285; *Falkenbach* v. *Patterson,* 43 Bard (N. Y.) 87; *Baine* v. *Sykes,* 72 Miss. 351, 16 So. 903; *Paine* v. *Hotel Co.,* 60 Miss. 360; *Eyrich* v. *Capital State Bank,* 67 Miss. 60, 6 So. 615; *Yardley* v. *Clothier,* 51 Fed.

506, 2 C. C. A. 349, 17 L. R. A. 462; *Bank* v. *Kretschmar,* 91 Miss. 608, O. C. 617-618, 44 So. 930.

We contend that it is fundamental that a surety is not entitled to subrogation until he fully pays and discharges the obligation of his principal. It is not sufficient that he discharges the obligation in part. He, must either fully discharge obligation or secure its payment in some satisfactory manner to the creditor. 37 Cyc. 374-375, 406; *Lee* v. *Griffin,* 31 Miss. 632, O. C. 638; *McGee* v. *Leggett,* 48 Miss. 139, O. C. 146; *Dry Goods Co.* v. *Kelly,* 80 Miss. 64.

It is undisputed that the Guaranty Company did not discharge the obligation of its principal, the depository, until the final decree was rendered in this case in the court below. That was too late to give the Guaranty Company the right to subrogation. It must have discharged the obligation of its principal before the suit was brought. It is a well established principle that all law suits are tried, so far as the rights of the plaintiff or complainant are concerned, according to the *status* at the time of the bringing of the suit. The plaintiff or complainant must have his claim on which he bases his suit at the time he brings his suit. He cannot acquire it afterwards. He cannot go into court without a just cause and after he gets in, buy up a just cause. 1 Cyc. 744.

However if we are mistaken in our contention so far, how can there be any doubt that if Cole is made to pay any part of the purchase price of these bonds again, to that extent he would be entitled to have returned to him the collateral and the proceeds of the collateral turned over by him to the First State Bank when he made settlement for these bonds. The evidence shows that when he had this collateral, the debt due him by the First State Bank was perfectly secure. I show that the collateral was worth, when he turned it over and when the evidence was, taken, about twelve hundred dollars. Surely Cole ought not be made to pay the purchase price

of the bonds again or any part of it, and this collateral also be taken away from him.

Etheridge, J., delivered the opinion of the court.

(After stating the facts as above). This appeal presents the following questions for decision in this case: First. Did the surrender of the notes held by G. W. Cole to the First State Bank as a payment on the bonds constitute a payment in law, or is he liable for the amount of said notes? Second. Is the United States Fidelity & Guaranty Company entitled to subrogation to such liability as may exist against Mr. Cole by virtue of its payment of the funds due to the county? Third. Is the National City Bank liable to the United States Fidelity & Guaranty Company under its contract for the amount paid by the United States Fidelity & Guaranty Company, or any part thereof, and, if for any part what part?

It appears from the evidence that the board of supervisors and county treasurer turned the bonds of the county over to the First State Bank for the purpose of delivering the bonds to Cole and collecting the money from Cole for the benefit of district No. 1 of Calhoun county; said First State Bank being then a duly qualified depository. It appears that the money and payment made by Cole was paid without having obtained a "received" warrant from the chancery clerk under section 352 .of the Code but that the receipt given by the depository was made out in duplicate as required by statute. It further appears in the evidence that the county treasurer gave his receipt for the money on the statement that Cole had paid the money into the depository.

We think it is the duty and obligation of bond buyers to pay for bonds in actual money, in the absence of an express statute authorizing the taking of something other than money in payment of bonds. Under the laws of this state, road funds and road bond funds are special funds, and can only be used in the payment of specified warrants,

and do not constitute a part of the county's general funds. We think that nothing can be accepted in lieu of cash, except warrants regularly issued against said fund when outstanding.   Where, however, a check is accepted in payment and is actually paid in due course, it will be treated as being a payment of the debt when the money is collected and paid into the proper treasury or depository of the county.   Our court has passed upon the question of payment in two recent cases involving the question as to whether an agent, authorized to collect money for a principal, is authorized to take anything other than money in payment.   In the case of *Parodi et al.* v. *State Savings Bank of Jackson,* 113 Miss. 364, 74 So. 280, the court held that a bank, having a draft for collection is required to take money in payment of such draft and if it take anything other than money, in this case a check, which check was not paid when presented, that the bank was not protected, even though the party giving the check was agent of the drawer of the draft and was making the final settlement of the agency with his principal.   In that case the person giving the check, at the date of the giving thereof, had funds in the bank upon which the check was drawn, but before the check was presented the bank failed and the check was not paid. In the case of *Bank of Shaw* v. *Ransom,* 112 Miss. 440, 73 So. 280, this court held that in collecting the check the bank is the agent of the depositor of the claim for collection, and that it was the duty of the collecting bank to collect in money, citing 7 Corpus Juris, 614, 615, and authorities cited therein.

We think therefore, that the depository was not authorized to take the notes held by Mr. Cole as payment for the bonds. We think, however that, the payment of three thousand dollars in August was understood by all parties to be a payment on the bond purchase, and that, though a note was taken at said time, it was not intended as a loan of money to the bank, and was not so understood by any of the parties to the transaction, and that

this constituted *pro tanto* a payment on the bond issue. It appears that Mr. Cole paid one item of one thousand dollars in cash and another payment by check, which was collected, of four thousand, four hundred and ninety-three dollars and twenty cents, making a total payment by Mr. Cole of eight thousand four hundred and ninty-three dollars and twenty cents and that he should be given credit for said amount on the bond purchase, but should be required to pay the difference to the appellant, as it has paid this amount to the county and road district, and is entitled to subrogation against the purchaser to this extent. If the parties signing the notes to Cole had authority to secure the loan for the First State Bank, and had authority to hypothecate the collateral to Cole, or if the First State Bank ratified the transaction and used Cole's money, then the collateral should be returned to Cole, or such money as was collected on such notes should be paid Cole from funds of the bank. The undertaking of the Guaranty Company was to guarantee the handling of funds paid into the depository, and as these funds never were, in law, paid by Cole, the appellant is entitled to recover them as against Mr. Cole.

In reference to the third proposition, as to liability of the National City Bank to the United States Fidelity & Guaranty Company under its contract, we find that section 5136 of the Revised Statutes of the United States, defining the powers of national banks, provides, first, that it has power to adopt and use a corporate seal; second, to have succession for the period of twenty years, unless it dissolve as therein provided; third, to make contracts; fourth, to sue and be sued in any court of law or equity as fully as natural persons; fifth, to elect or appoint directors, and by its board of disectors to appoint a president, vice president, cashier, and other officers, and define their duties, and to dismiss such officers and appoint others to fill their places; sixth, to prescribe, by its board of directors, by-laws not inconsistent with law, etc.; seventh, "to exercise by its board of directors, or

duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt, by receiving deposits, by buying and selling exchange, coin, and bullion, by loaning money on personal security, and by obtaining, issuing, and circulating notes according to the provisions of this title. But no association shall transact any business except such as is incidental and necessarily preliminary to its organization, until it has been authorized by the Comptroller of the Currency to commence the business of banking."

It is settled by a long list of authorities that a national bank cannot be held liable for acts in excess of its charter powers, and that such bank is not estopped to plead *ultra vires* in defense of any unlawful contract; that it had no power to lend its credit by guaranteeing the letter of credit or making and indorsing notes or drafts for the accommodation of other persons. See 5 Fed. Statutes Annotated, p. 82, authorities there cited. It is equally well settled that a bank that executes a contract even beyond its powers, but receives funds or property by virtue of such contract, is liable to the extent that it has received funds or property or has received benefits from such *ultra vires* contract. See *Citizens' National Bank* v. *Appleton,* 216 U. S. 196, 30 Sup. Ct. 364, 54 L. Ed. 443; *First National Bank* v. *Anderson,* 172 U. S. 573, 19 Sup. Ct. 284, 43 L. Ed. 558; *Emmerling* v. *First National Bank,* 97 Fed. 739, 30 C. C. A. 399; *Logan County National Bank* v. *Townsend,* 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107; *American National Bank* v. *National Wall Paper Co.,* 77 Fed. 85, 23 C. C. A. 33; *Hutchins* v. *Planters' National Bank,* 128 N. C. 72, 38 S. E. 252; *First National Bank* v. *Henry,* 159 Ala. 367, 49 So. 97.

In *Citizens' National Bank* v. *Appleton,* 216, U. S. 196, 30 Sup. Ct. 364, 54 L. Ed. 443, the court held that a national bank which, in pursuance of a previous agreement with its debtor that he will apply to the discharge of the

indebtedness a part of the proceeds of a loan to be obtained by him from another bank, requests the making of such loan and guarantees its payment at maturity, must account to the loaning bank for the sum which it receives for its own use in execution of the agreement, even though such guaranty is beyond its powers under the National banking statutes. In *First National Bank* v. *Anderson*, 172 U. S. 573, 19 Sup. Ct. 284, 43 L. Ed. 558, the court held that where a national bank, which has purchased notes that it holds as collateral when it has been directed to sell them to a third person, may be held liable for their value as for a conversion, even though it is not within the powers of the bank to sell them as the owner's agent. In *Logan County National Bank* v. *Townsend*, 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107, the supreme court of the United States held that, where property is transferred under a contract which is merely *malum prohibitum*, the party receiving may be made to refund, to the person from whom it has received the property for the unauthorized purpose, the value of that which it has actually received. "A national bank having the right to hold bonds until reimbursed for its advances, but being bound, upon implied contract, to return them, on demand, when repudiating as illegal the agreement under which it got them, is not exempt, by reason of anything in the National Banking Act, from liability, but is liable for the difference between the price it paid for them and their value at the time it refused, upon demand, to return them in pursuance to the contract made by it for their purchase." In *Wyman* v. *Wallace*, 201 U. S. 230, 26 Sup. Ct. 495, 50 L. Ed. 738, the United States supreme court held that where a national bank gave notes, when embarrassed by pressing demands, in part consideration of the assumption by the payee of all its outstanding obligations, secured by a pledge of all its assets remaining after turning over cash and such bills receivable as the payee would accept at par, are valid obligations, which can be enforced against the stockholders

after voluntary liquidation. In *Poppleton* v. *Wallace,* 201 U. S. 245, 26 Sup. Ct. 498, 50 L. Ed. 743, it was held that such obligations were valid obligations, and may be enforced after voluntary liquidation against the stockholders who had voted against liquidation. It will be seen, from the Revised Statutes above quoted from, that a national bank has undoubtedly the right to receive deposits and make appropriate contracts with reference thereto. It has the power to make a bond to secure deposits. 3 Mitchie on Banks and Banking, p. 2026.

There seems to be no restriction in the act itself, nor can we see any reason to imply any restrictions, that the bank may make any contract with reference to the re-receipt of deposits agreeing to handle the deposits in a certain way and to pay them out only in a certain prescribed way necessary for the protection of the parties dealing with it, and we are of the opinion that its contract in this case, by which it agreed to receive the deposits of money paid to the First State Bank as a public depository, and to cause the certificates of deposit to be assigned to the Guaranty Company, was valid, and was not beyond its powers. It appears in the testimony that the cashier of the National City Bank, in discussing this proposition with the agent of the First State Bank, stated that he would rather borrow money at four and one-fourth per cent than to loan money at eight per cent. This statement indicates that the bank's applications for loans were in excess of funds available for loan purposes. Of course, it is necessary for a bank to have funds to loan its customers, when needed, to retain them. It is also one of the methods by which banks make money, borrowing money at a smaller rate and loaning it at a higher rate. In this way it also serves the interests of the public in receiving money, which depositors do not need, or do not care personally to handle, by way of deposits, and loaning it out at interest to people who desire to borrow, and we think that that part of the contract between the National City Bank and the Guaranty Company that provided for

the method of handling this fund and by which the bank undertook to see or agreed would be done was not beyond its powers.

It having undertaken by contract to cause that money sent to it by the First State Bank received under the depository bond should be handled in a particular way, calculated to safeguard the interest of the surety company, without serious inconvenience to the National City Bank or to the First State Bank, we think it cannot escape obligations which it imposed upon itself in this regard on the mere theory that it had not received notice that the second bond issue had been made, nor notice that the funds received by it from the First State Bank were in reality funds belonging to the road district. In assuming this obligation, it assumed an obligation to keep in touch with the affairs of the depository, and it was an easy matter for it to learn from the public records that this bond issue had been sold and the money paid into the depository. It was the duty of the National City Bank under the facts in this case, when it received remittances from the First State Bank, to determine the character of the funds so received, whether they were public funds or private funds of said bank. We think there is no *ultra vires* act with reference to this part of the agreement.

We do not think the National City Bank's liability is limited to profits it may have made out of this transaction. Indeed, the transaction might have been a losing one to the bank, and still it would be liable for the moneys actually received. It having imposed a duty upon itself to deal with this fund in a specific way, it cannot escape liability by pleading ignorance of facts it should have known under its contract, and could easily have ascertained by reasonable diligence. We think the National City Bank is liable to the Guaranty Company to the extent of the funds that actually passed through its channels, to wit, the amount of seven thousand four hundred ninety-three dollars and twenty cents, and for attorney's fees which the Guaranty Company had to pay by reason

of the default of the First State Bank and of the National City Bank in not carrying out this contract as agreed to.

In order that the court below may not be hampered in administering the rights between all the parties to this litigation in accordance with the views expressed in this opinion, the case is reversed on both direct and cross appeals; the costs of appeal to be taxed against the appellees.

*Reversed and remanded.*